[Civ. No. 23435. First Dist., Div. Two. May 18, 1967.]

PHILLIP H. CALABRESE, Plaintiff and Appellant, v.
COUNTY OF MONTEREY, Defendant and Respondent.

Thompson & Thompson and David M. Hollingsworth for Plaintiff and Appellant.

William H. Stoffers, County Counsel, Roy E. Anderson and Willis E. Haines, Deputy County Counsel, for Defendant and Respondent.

SHOEMAKER, J. — Plaintiff Phillip Calabrese brought this action against the County of Monterey to recover damages in the amount of $40,866.05 for extra work and materials furnished in connection with the construction of a highway in said county.

Defendant county answered and raised the defense, among others, that plaintiff's cause of action was barred by his failure to present it to the county within one year of its accrual, as required by statute (former Gov. Code, §§ 710-715).

An amended pretrial conference order provided that prior to any trial on the merits, two issues would be tried first and separately: (1) defendant's contention that plaintiff's action was barred by the claims statute, and (2) plaintiff's contention that defendant was estopped from asserting noncompliance with said statute.

This limited trial was held and the following evidence produced: On February 26, 1959, the Department of Public Works, Division of Highways, of the State of California, entered into a written contract with plaintiff whereby plaintiff undertook to grade and surface 2.2 miles of highway in the County of Monterey. The contract incorporated the Standard Specifications of the Department of Public Works, Division of Highways.

Section 10, article (b), of said specifications provided in pertinent part that: "It is anticipated that utility facilities and other improvements . . . that are required to be removed, altered or relocated as a part of the highway improvement will be removed, altered or relocated in advance of construction operations at no cost to the Contractor. . . . Any unavoidable delays to the Contractor's operations as a direct result of utility facilities and other improvements not being

removed or relocated as above provided, will be considered right of way delays within the meaning of Section 8, article (h), of these specifications and the State will compensate the Contractor to the extent provided therein but not otherwise.''

Section 8, article (h), of the specifications provided that if the state's failure to acquire or clear rights of way should cause the contractor to sustain loss which could not have been avoided by the judicious handling of forces, equipment and plant, he should be paid such amount as the State Highway Engineer might find to be a fair and reasonable compensation for such part of the contractor's actual loss as in the engineer's opinion was unavoidable.

Plaintiff commenced performance on March 9, 1959. In April 1959, it became apparent that plaintiff could not continue to work with any efficiency around certain utility poles which had not been removed from the right of way. After a meeting attended by plaintiff, representatives of the Division of Highways, the Monterey County Road Commissioner and a construction engineer from said county, it was agreed that work would have to be suspended for a period of two months while the utility poles were removed from the right of way.

Construction work resumed following the two-month stoppage and was completed on September 4, 1959. Notice of completion was filed by the Department of Public Works on September 8, 1959 and recorded on September 10, 1959. All progress payments, under the contract, were in the form of warrants signed by the State Controller.

Sometime later in the month of September 1959, plaintiff addressed a letter to District V of the Division of Highways which set forth plaintiff's claim for additional compensation on account of certain ''clearing and grubbing'' and excavating expenses allegedly incurred as a result of the state's failure to remove the utility poles from the right of way.

In December 1959, plaintiff met with Wofford, an assistant engineer of the Division of Highways, who was in charge of all operations in the district where plaintiff did his work. Wofford advised him as to the proper procedure to be followed in presenting his claim.

Plaintiff thereafter filed a claim with the Board of Review, and a hearing was scheduled for May 3, 1960. The day before said hearing, plaintiff employed Thompson, an attorney, to represent him at the hearing.

Thompson testified that the hearing was very informal in nature and that plaintiff and a representative of the Division

of Highways presented their respective positions relative to plaintiff's claim. Thompson subsequently received a letter dated August 19, 1960 from the State Highway Engineer, advising that his claim was turned down.

On September 27, 1960, Thompson wrote the State Highway Engineer, stating that he had been informed that the May 3 hearing was "informal" in nature and that to further process plaintiff's claim, a request for a "formal" hearing should be made. Thompson asked to be advised of the procedural steps required under the administrative rules of the Division of Highways.

By letter of October 10, 1960, the State Highway Engineer advised Thompson that he was required to file the claim with the State Board of Control preparatory to bringing suit thereon.

On February 14, 1961, Thompson filed a claim with the Board of Control, and a hearing was scheduled for September 5, 1961. Before said hearing, Thompson was furnished a copy of a letter, dated May 2, 1961, which had been filed with the Board of Control by Finch, an attorney for the Department of Public Works. This letter stated that plaintiff had already been compensated for the utility delay and that a change order establishing the damages resulting from said delay had been prepared and executed by all the parties. The letter further stated that "this is a Federal-Aid Secondary project involving Federal and County funds. Federal law requires that the State supervise these county FAS projects and award the contracts. As a result, the State is the nominal contracting party, but the county is the real party in interest. A denial of this claim would be necessary for the claimant to commence an action at law on this matter."

Thompson testified that he did not understand the above-quoted portion of the letter. He had previously reviewed plaintiff's contract with the Division of Highways, had found no mention of the county and had been under the impression that plaintiff and the state were the only parties to the contract. He also knew that plaintiff had been paid by the state. He had read section 8, article (h) and section 10, article (b), of the specifications incorporated in the contract and had concluded that the state alone was responsible for utility delays.

At the hearing on September 5, 1961, Thompson was advised by the chairman of the Board of Control that the board preferred not to hear plaintiff's claim on the merits, since the procedure involved was technical and a mere formality re-

quired as a condition to plaintiff's commencing an action at law. When Thompson expressed dismay and indicated that he wanted a full hearing, Finch, who was representing the State Highway Engineer, stated that it would be improper to hear the claim on its merits because even though the state was the nominal contracting party and plaintiff was required to pursue the administrative remedies he had thus far completed, the County of Monterey was the ultimate real party in interest and the claim would have to be paid from county funds. According to Thompson's testimony, he was then for the first time fully aware of the state's claim that plaintiff's cause of action was against the county only.

The chairman of the Board of Control then informed Thompson that plaintiff's claim was summarily denied, that his administrative remedies had been exhausted and that he could take whatever procedural steps were required against the County of Monterey. By letter dated September 6, 1961, Thompson was advised that the board had denied plaintiff's claim on the preceding day.

On June 4, 1962, Thompson, acting as the attorney for Calabrese, filed his complaint to recover damages for the utility delay from the State of California, Department of Public Works.

On September 4, 1962, Thompson filed plaintiff's utility delay claim with the County of Monterey. Thompson's testimony was to the effect that he was still unaware of the basis, if any, of plaintiff's cause of action against the county, and he filed the claim merely as a precautionary measure and in reliance upon the representations made by Finch at the hearing before the Board of Control. He was also of the opinion that he was required to file plaintiff's claim against the county within one year of the Board of Control's decision denying plaintiff's claim.

On September 7, 1962, Thompson dismissed plaintiff's action against the Department of Public Works, since he had concluded that the true "defendant" was the county.

Within a few days after filing the claim against the county, Thompson talked with Thornberry of the county counsel's office and was informed that the state and county had entered into some sort of agreement prior to the execution of plaintiff's contract of February 1959. Thompson asked for a copy of the agreement. Thornberry sent it to Thompson some two months after the filing of the claim against the county. This agreement, dated December 1, 1958, was between the County

of Monterey and the "Department of Public Works (Division of Highways) of the State of California." It provided in pertinent part that in connection with federal-aid secondary projects, the county would furnish such rights of way as were necessary for the construction of the proposed improvements. The rights of way required to be furnished included "all real property required for the improvement free and clear of obstructions and encumbrances. . . ." The county also agreed "to pay from county funds any costs, which are incurred in connection with this project, which arise out of right of way litigation or delays to the contractor because right of way has not been made available to him for the orderly prosecution of the work." With regard to "Claims," the agreement provided that "Since this project is not on a State Highway, State Highway funds may not be used to finance any costs including claims submitted by the contractor, Public Utilities, Rights of Way or other pertinent charges. In the event that such claims are submitted and the Bureau of Public Roads and State Attorneys rule such claims cannot be paid by funds provided by the Federal-Aid Highway Acts the County will upon the demand of the Department, deposit with the State Treasurer, a sum sufficient to cover the cost of any or all claims."

Upon reading this agreement, Thompson said he realized for the first time the nature of plaintiff's claim against the county.

In the meantime, on September 17, 1962, the Monterey County Board of Supervisors had voted to deny plaintiff's claim.

Wofford testified that the contract awarded to plaintiff was for the construction of a federal-aid secondary project. The federal government makes available money which is matched by state and county funds and used for construction projects in the secondary system. The disbursal of these funds and the administration of the construction contracts is handled entirely by the state.

At the conclusion of the limited trial, the court found that plaintiff was required by statute to present a written claim to defendant county for the damages sought in his complaint before bringing suit against defendant; that plaintiff presented his claim to defendant on September 4, 1962, and the same was rejected by defendant on September 17, 1962; that plaintiff's claim was related to causes of action which required it to be presented not later than one year after the accrual of such causes of action; that plaintiff's claim was

presented more than one year after the accrual of his causes of action; that defendant was not estopped from asserting noncompliance with the statutes pertaining to the presentation of claims; that plaintiff's causes of action were barred by virtue of his failure to file a timely claim with defendant.

Judgment for defendant was accordingly entered, and plaintiff filed notice of appeal therefrom.

 Plaintiff concedes that he was required to file his claim against the county within one year of the accrual of his cause of action. However, he contends that his cause of action did not accrue until he acquired a legal right to bring suit upon it and that he did not acquire any such right until he had exhausted his administrative remedies against the state by presenting his claim to the Board of Control. Plaintiff apparently takes the position that the agreement between the state and the county was essentially an indemnification agreement which required the county to deposit with the State Treasurer whatever funds were necessary to indemnify the state against the payment of utility delay claims to contractors. From this he reasons that his cause of action against the county, as a beneficiary of the indemnity agreement, could not arise until "all of the conditions which would establish the liability of the State (the 'person indemnified') had occurred." According to plaintiff, "This is seen from the fact that had no claim been presented to the Board of Control, the State would have had an absolute defense based on the claim statute to any lawsuit seeking to establish its liability. . . . Putting the same point another way, prior to September 5, 1961, plaintiff's cause of action was subject to a condition precedent—the presentation and rejection of a timely claim— and was thus, prior to such time, only inchoate and unperfected. The County, as indemnitor, had no liability as of then because the State had no fixed liability. Upon rejection of the claim by the Board of Control, however, the liability (if any), became fixed, subject only to being established by a subsequent lawsuit. The County's liability also . . . thus matured at the same time."

We do not agree. If plaintiff is correct in asserting that his cause of action against the county, in its capacity as an indemnitor of the state, could not arise until the liability of the state had become "fixed," it is apparent that plaintiff's cause of action against the county has not yet arisen and, from the record, never will arise. Although plaintiff is apparently under the impression that the state's liability somehow

became established when the Board of Control denied his claim for additional compensation arising out of the utility delay, it is apparent that the only effect of said denial was to entitle plaintiff to bring suit against the state within six months of the date of denial (see former Gov. Code, § 644; Stats. 1959, ch. 1715, § 2, p. 4118). Although plaintiff did commence an action at law within the time allowed, said action was dismissed three months and three days later. As far as the record is concerned, this action was never reinstated.

We note also that the state was not made a party to the instant action. Any such action would have been futile, for it was barred by the statute of limitations. We are forced to conclude that if plaintiff is seriously contending that his cause of action against the county could not arise until the state's liability had been established, he is, in effect, admitting that he has no cause of action against the county.

Plaintiff also argues, apparently in the alternative, that an adjudication of the state's liability was not a condition precedent to his right to bring suit against the county. He asserts that as a third party beneficiary of the agreement between the state and the county, he acquired a cause of action against the county, as the indemnifier and real party in interest, immediately upon the occurrence of the act indemnified against. Plaintiff apparently equates ''the act indemnified against'' with the doing of the extra construction work which affords the basis for his claim of additional compensation. He contends that upon the occurrence of said act, the county, as the indemnifier of the state, not only became liable jointly with the state but became liable separately as well to plaintiff, as the person injured by the act indemnified against.

This argument obviously leads plaintiff nowhere, since if he is correct in asserting that his cause of action against the county arose immediately upon the performance of the extra work necessitated by the utility delay, it is apparent that exhaustion of plaintiff's administrative remedies against the state was not a condition precedent to the filing of his claim against the county and that the time spent in pursuing such remedies cannot be excluded from the one-year period within which he was required to file said claim.

Plaintiff's next contention is based upon the fact that plaintiff was totally unaware, until the hearing before the Board of Control or shortly prior thereto, of any agreement between the state and the county and of the existence of a

possible cause of action against the county, and he refers to his counsel's testimony as to his information gained from representatives of the state.

▮ Plaintiff thus contends that various state officials misled him into believing that he was required to pursue the administrative remedies which culminated in the Board of Control hearing on September 5, 1961, and that said officials also concealed from him, until said hearing, the county's ultimate responsibility for damages resulting from utility delays. Plaintiff reasons that the county is estopped from asserting that the one-year period within which he was required to file his claim commenced running at an earlier date than September 5, 1961. Plaintiff bases his claim of estoppel upon the theory that the representations and concealments of the state officials are directly attributable to the county because the county was an undisclosed principal and the state was at all times acting as its agent.

The basic difficulty with this argument is that the record contains no evidence in support of plaintiff's agency theory. The county was not a party to the 1959 construction contract, which was between plaintiff and the Division of Highways only. The specifications incorporated into said contract provided that the state should be responsible, to the extent therein specified, for losses which the contractor might sustain as a result of utility delays. Although it is true that the State Division of Highways had previously entered into a cooperative agreement with the county wherein the county agreed to furnish unobstructed rights of way and also agreed to deposit with the state whatever sums were required to pay contractors' claims arising out of right of way delays, this agreement certainly did not make the state the agent of the county for the purpose of administering construction contracts and negotiating claims arising therefrom. Cooperative state-county agreements are expressly authorized by state statute in connection with federally financed secondary highways. (Sts. & Hy. Code, § 2210.) However, federal statute nevertheless requires that "The construction of any highways or portions of highways located on a Federal-aid system shall be undertaken by the respective State highway departments or under their direct supervision. . . . The construction work and labor in each State shall be performed under the direct supervision of the State highway department and in accordance with the laws of that State and applicable Federal laws." (23 U.S.C.A. § 114, subd. (a), p. 35.)

The dominant role of the state is also apparent from a reading of the 1958 agreement between the Division of Highways and the County of Monterey. Said agreement provides in pertinent part that "It is understood that the Department is held responsible by the United States Government for the conduct of the work and for satisfactory results and that the Department may not delegate its responsibility. It is therefore agreed that the Department will exercise general supervision over the work. . . ." The agreement also provides that "Actual construction work will be performed by contract. The Department will make the final preparation for advertising, will advertise and award the contract and will make payments to the contractor as the same become due." The county's only responsibility was to furnish unobstructed rights of way and to deposit, upon demand by the state, funds sufficient to cover contractors' claims arising from right of way delays.

In the light of the foregoing, the state did not become the agent of the county merely by entering into the 1958 agreement. We find no basis for holding that the acts of the various state officials who advised plaintiff as to his procedural remedies were attributable to the county and resulted in estopping it from requiring the timely filing of plaintiff's claim. Moreover, an examination of the applicable provisions of plaintiff's construction contract and of the state-county agreement leads unerringly to the conclusion that plaintiff was correct in characterizing the county's role as that of an indemnitor only; that plaintiff was in fact required to present his claim to the state in the manner described by the various state officials whom he consulted; and that the county was not required to deposit the funds required to cover such claim until the state, having settled the claim or having had its liability thereon determined, demanded that the county do so. It would accordingly appear that the only misadvice, if any, which plaintiff received from state officials occurred at the hearing before the Board of Control, when plaintiff's attorney apparently acquired the impression that the state was in no way liable for plaintiff's claim, even if meritorious, and that he had no alternative but to cease the pursuit of his legal remedies against the state and proceed directly against the county. Be that as it may, any such misadvice clearly cannot be attributed to the county on an agency theory, since, as we have indicated, the state was acting for itself only.

The theory of the instant action, which is not predicated upon any pre-existing liability on the part of the state,

is that the county is directly liable to plaintiff for the extra work necessitated by the utility delay, independent of any duty to indemnify the state. Assuming the existence of any such cause of action against the county, it must have arisen, at the latest, when the extra work was performed and thus prior to the completion of the construction project on September 4, 1959. It is the general rule that the applicable statute of limitations begins to run even though the plaintiff is ignorant of his cause of action or of the identity of the wrongdoer. (1 Witkin, Cal. Procedure (1954) Actions, § 112, p. 615; *Rubino* v. *Utah Canning Co.* (1954) 123 Cal.App.2d 18, 27 [266 P.2d 163].) ■■■ Plaintiff has failed to demonstrate any basis for holding that the county is estopped from relying upon the applicable one-year period within which plaintiff was required to file his claim.

Judgment affirmed.

Agee, J., and Taylor, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 26, 1967. Peters, J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.