Filed 6/15/16  Winston v. County of Kern CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| SAMANTHA WINSTON, Plaintiff and Appellant, v. COUNTY OF KERN, Defendant and Respondent. | F071409 (Super. Ct. No. S-1500-CV-280158) **OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Lorna H. Brumfield, Judge.

Douglas B. Malcolm; Tardiff Law Offices and Neil S. Tardiff for Plaintiff and Appellant.

Hall, Hieatt & Connely, Jay A. Hieatt and Stephanie A. Bowen for Defendant and Respondent.

-ooOoo-

On August 31, 2012, Samantha Winston awoke from surgery at Mercy Hospital (Mercy) to remove an epidural abscess caused by methicillin-resistant staph aureus (MRSA) to find herself paralyzed.  Before her admission to Mercy, Winston had been

treated at Kern Medical Center (KMC), a facility run by the County of Kern (County), for a MRSA infection.

On August 29, 2013, Winston served the County with a claim under the Government Claims Act (Gov. Code, § 810 et seq.) (the Claims Act)[1] and initiated this action by filing a complaint for medical malpractice.[2]  The County rejected Winston's claim as untimely.  Winston subsequently filed a first amended complaint (FAC) against the County, Mercy, the surgeon, Dr. Timothy Wiebe, and Bakersfield Neuroscience & Spine Institute, in which she alleged the defendants were negligent in failing to diagnose her MRSA infection and in rendering surgical services.  The trial court granted the County's motion for summary judgment on the ground that Winston's claim against the County was barred by her failure to timely file a claim under the Claims Act.

On appeal, Winston contends there are triable issues of fact as to when her cause of action against the County accrued and the County is estopped from asserting a late-claim defense because its notice of rejection of her claim was defective.  We reject her contentions and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Complaint and Winston's Claim Against the County*

In the claim that Winston's attorney, Douglas B. Malcolm, mailed to the County on August 29, 2013, Malcolm asserted that after Winston's August 31, 2012 surgery at Mercy and subsequent treatment at Children's Hospital Central California (Children's

---

[1] Undesignated statutory references are to the Government Code.

[2] The record is conflicting regarding the date the original complaint was filed. The Register of Action/Docket in the superior court case states that the filing date of this action was August 29, 2013, when a complaint was filed.  With respect to the County's summary judgment motion, however, the parties agreed that Winston filed the complaint on August 30, 2013, and the trial court granted the County's request to take judicial notice of the complaint filed on August 30, 2013.  The complaint is not part of the appellate record.

2.

Hospital), Winston continued to receive medical treatment at KMC. Winston, however, was not told that KMC's physicians or staff had done anything improper; instead, physicians and staff told her she had received proper care at KMC and its associated clinics. Winston contacted Malcolm, who obtained her medical records from KMC at the end of June 2013; the records showed Winston received treatment for MRSA at KMC in August 2012, before her surgery, including an inpatient hospitalization and follow-up treatment. Based on the information in those records, Malcolm believed Winston had a colorable claim that her treatment at KMC fell below the standard of care and was a substantial factor in her need for surgery. Malcolm asserted Winston's claim was timely because she only recently had discovered KMC's potential role in her injury as a result of his timely and diligent pre-litigation discovery.

The County filed the claim on September 3, 2013, but rejected it on September 9, 2013 because it was not filed within the six months required by section 911.2. The "Notice of Filing Late Claim[,]" which the County sent to Winston's attorney, listed the date of the incident as "August 2012" and advised as follows: "Notice is hereby given that the claim you submitted to the Clerk of the Kern County Board of Supervisors on 09-03-2013 is being returned because it was not presented within six (6) months after the event or occurrence as required by law: no action was taken on your claim. [¶] Your only recourse at this time is to apply without delay to the Clerk of the Kern County Board of Supervisors for leave to file a late claim. See Section 911.4 to 912.2 of the California Government Code. Under some circumstances, leave to present a late claim will be granted. See Section 911.6 of the California Government Code. [¶] You may seek the advice of an attorney of your choice in connection with this matter. If you intend to consult an attorney, you should do so immediately."

Winston, who had already filed her original complaint in this action, did not file an application with the County for leave to present a late claim. Instead, she filed a first amended complaint (FAC) on September 30, 2013, which contained a single cause of

3.

action for medical negligence. The FAC alleged that (1) on August 31, 2012, Dr. Wiebe operated on her at Mercy, after which she was paralyzed; (2) both before and after August 31, 2012, Winston consulted with the County's health care providers for medical examination, diagnosis care and treatment; and (3) the defendants acted below the standard of care by negligently examining and treating her, failing to diagnose her MRSA infection, and rendering surgical services. The FAC further alleged that Winston had filed a claim with the County, which was rejected.

The County answered the complaint in June 2014, alleging as an affirmative defense Winston's failure to comply with the Claims Act.

*The Summary Judgment Motion*

The County subsequently filed a motion for summary judgment asserting, in part, that Winston's cause of action for medical negligence against it was barred by the six-month statute of limitations applicable to actions against a public entity. The County contended her action was barred because she did not submit a claim to the County within six months of the date the claim accrued, namely August 31, the date Winston first suffered paralysis from the epidural abscess.[3] The County asked the trial court to take judicial notice of Winston's government claim and the complaint filed on August 30, 2013.

The County's separate statement set forth the following facts. Winston was diagnosed with sickle cell anemia at a young age, and had been hospitalized many times

---

[3] The County also sought summary judgment on the grounds that Winston was unable to establish either that KMC fell below the standard of care or that KMC's acts or omissions were a substantial factor in causing her injuries. In its reply brief, the County withdrew its motion as to these issues and proceeded only on the issue of whether Winston's action against it was barred by the statute of limitations and her failure to comply with the Claims Act.

4.

over her life for sickle cell problems. In July 2012, 19-year-old Winston went to Mercy on several occasions for sickle cell pain crises.[4]

On August 6, 2012, Winston came to KMC's family practice clinic. Winston reported that since her discharge from Mercy, she had been experiencing severe chest and joint pain; it hurt from her chest to her back and neck, and she had lost 23 pounds in the past three weeks. The clinic physician sent Winston to KMC's emergency room via ambulance. Once there, Winston complained of a sudden onset of constant severe, sharp pain that was diffuse throughout her body and which she felt deep in her bones. Winston was admitted to KMC. The next day, Dr. Navin Amin evaluated Winston; lab tests were obtained and a chest x-ray was found to be normal. Dr. Amin assessed Winston with sickle cell disease, and suggested she continue on all her medications and be given fluid and pain management. Dr. Amin ordered a "sed rate," an ultrasound of her gallbladder, blood and urine cultures, and "cocci serology."

On August 8, the blood cultures came back positive for gram positive cocci resembling staff or strep, and Vancomycin was ordered. On August 10, Winston was diagnosed with MRSA sepsis and the dose of Vancomycin was increased accordingly. On August 14, it was noted that her MRSA sepsis was responding; two repeat blood

---

[4] Winston went to Mercy four times in July 2012: (1) on July 12, she went to the emergency department complaining that her body ached all over, but primarily in her legs and lower back – she was diagnosed with mild transient vaso-occlusive pain and discharged home with a short course of Vicodin for pain; (2) on July 21, she returned to the emergency department complaining of pain that started two hours before arrival – she was treated with medication, including Benadryl, and discharged home; (3) later that day, Winston returned complaining of "pain all over" – she was admitted to the hospital for evaluation and treatment, but left the hospital on July 25 against medical advice because she could not miss school; and (4) on July 26, she returned stating she had worsening weakness and increasing pain – she was assessed with generalized body aches secondary to painful sickle cell crisis, and while MRSA grew in the blood in initial drug cultures, did not have signs or symptoms of an active infection, so she was discharged home on August 1 with Vicodin for pain, but no antibiotics.

cultures showed no growth. Dr. Amin discontinued the Vancomycin, started Winston on 600 mg of Zyvox twice daily for an additional week, and discharged her home after a blood transfusion.

Winston followed up at KMC on August 20. She said she had not taken any antibiotics since her discharge because there was an issue with her prescription. She reported constant pain in her abdomen, back, ribs, neck and left arm. A blood culture was taken, which showed no growth. The doctors determined that Winston should continue her current management and follow-up with her primary care doctor in 10 days. Winston was instructed to return to the emergency room if her pain increased, or she had a fever or chills.

On August 26, Winston went to Mercy complaining of pain in her ribs, back and shoulders that increased with certain movements. She also had pain in both of her upper arms, but more so in her left arm. Winston was diagnosed with sickle cell disease crisis, anemia and hypokalemia, and admitted to Mercy. A CT scan was ordered after Winston complained of pleuritic chest pain; the scan showed a concern for osteomyelitis at C7 and T6. An MRI performed on August 29 confirmed an epidural abscess. On August 31, Dr. Wiebe operated on Winston; he performed laminectomies and evacuation of the epidural abscesses at C6-T1 and T4-T6. Following the surgery, Winston reported a loss of sensation and paralysis in her lower extremities. A post-operative MRI performed on August 31 continued to show an epidural abscess. Dr. Wiebe performed a second surgery on Winston on September 23. Following that surgery, Winston's paralysis was higher up on her body.

*Winston's Opposition*

Winston's opposition was accompanied by her declaration in which she addressed the timeliness of her claim. She declared that after she woke up from her August 31 surgery at Mercy and discovered she was paralyzed, her neurosurgeon told her the paralysis was due to a stroke of her spinal cord and might improve. After her second

surgery at the end of September, Winston was hopeful her paralysis would improve, but instead it became temporarily worse and shortly thereafter she assumed her paralysis was permanent. Winston had been paralyzed since immediately after the first operation and was permanently confined to a wheelchair.

Winston was transferred to Children's Hospital, where she spent several months recovering from her injuries.[5] After her discharge, she returned to Bakersfield and continued receiving medical care from KMC and its clinics. Before her admission to Mercy in August 2012, she had been treated at KMC for "many weeks and months" for her "multiple medical problems." None of her healthcare providers, including those at KMC or its clinics, Mercy, or Children's Hospital, ever told her that KMC or its clinics had mismanaged her care or were responsible in any way for her paralysis.

Winston saw infectious disease specialist Dr. Royce Johnson at KMC on March 25, 2013. Winston reviewed the note of this visit; Dr. Johnson did not mention anything about any role the treatment she received at KMC or its clinics may have had in causing her paralysis. According to Winston, Dr. Johnson stated in the note that she was in her usual " 'fair state of health' " until she was admitted to Mercy in late August 2012, and he does not mention her treatment at KMC or its clinics before her paralysis.[6]

Winston believed her paralysis was due to mismanagement of her surgery, since she was not paralyzed before the August 31, 2012 surgery and was paralyzed immediately thereafter. Winston declared that she was still in high school when she had

---

[5] Winston was discharged from Mercy on October 16, 2012, and transferred to Children's Hospital; she was discharged from Children's Hospital in March 2013.

[6] The note states, in pertinent part: "HISTORY OF PRESENT ILLNESS: The patient is a 20-year-old African American female with sickle cell disease. She was in her usual only fair health until 08/26/2012 at which time she developed fever, increased white count, and back pain as well as generalized body pain. She was hospitalized at Mercy Hospital, Bakersfield and was found to have MRSA bacteremia. Subsequent workup most importantly included an MRI of the spine which revealed spinal epidural abscesses at C7 and T6."

the first surgery at Mercy, and she had no medical training, other than a month-long training course during high school to become a nursing assistant.

Winston retained attorney Malcolm in July 2013. She told him about the stroke of her spinal cord, that her paralysis occurred immediately after the surgery at Mercy, and that she believed something had gone wrong during the surgery. In late August 2013, Malcolm told her he had obtained several thousand pages of medical records from KMC, and as a result of reviewing those records, he suspected that her care at KMC may have been mismanaged and led to her eventual surgery and paralysis. Winston declared that she had not suspected prior to that time that any possible mismanagement at KMC or its clinics could have caused or did cause her paralysis.

Winston stated that they filed a claim with the County describing her injury on August 29. She believed her belated discovery of the County's role in her paralysis was reasonable because: (1) her paralysis occurred as a result of a stroke during the operation at Mercy; (2) she has no medical training or significant experience; (3) no health care professional had ever told her of any mismanagement at KMC that may have contributed to her stroke; and (4) she continued to received treatment at KMC and Dr. Johnson described her as being in her usual state of health before her admission to Mercy.

Malcolm also submitted his declaration in opposition to the motion, in which he declared that Winston contacted him in the spring of 2013 to evaluate a potential case against Mercy and Dr. Wiebe. According to Malcolm, Winston did not suspect that the County had any role in her paralysis. In early July 2013, he obtained medical records from KMC during the course of his pre-litigation investigation and Winston retained him to represent her in mid-July 2013. His review of her medical records in August 2013 indicated a potential claim against the County and he mailed a claim against the County alleging facts of belated discovery on August 29.

In her points and authorities opposing the motion, Winston argued that (1) her claim was presented on August 29, 2013, when the claim was mailed to the County, not

on September 3, when the County received it; (2) the County waived its late-claim defense because it gave improper notice of the late claim since the notice failed to reference sections 901 and 911.2, as required by section 911.3, subdivision (a); (3) the claim was timely on its face because Winston asserted she was unable to discover KMC's role despite reasonable diligence on her part, and therefore the County was required to provide the warning mandated by section 913; (4) she has the right to a jury trial on factual issues regarding accrual of her cause of action, as her and Malcolm's declarations raised material issues of fact; and (5) she substantially complied with the Claims Act by serving the County with her FAC, which alleged presentation and rejection of Winston's claim.

*Ruling*

After oral argument on the motion and taking the matter under submission, the trial court issued a minute order granting the County's requests for judicial notice and its motion for summary judgment. The trial court found that the County met its burden of showing it had an absolute defense to Winston's only cause of action, and Winston failed to submit evidence to create a triable issue of fact material to her untimely filed claims under the Claims Act. The trial court subsequently signed a written order granting the motion, which added that it found, as a matter of law, that Winston's action against the County was barred by the statute of limitations and her failure to comply with the Claims Act. Judgment was entered in the County's favor.

## DISCUSSION

The standards for reviewing summary judgments are well established. "Summary judgment is appropriate only if there is no triable issue of material fact and the moving party is entitled to judgment in its favor as a matter of law. [Citation.] . . . A defendant moving for summary judgment . . . must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense. [Citation.] The defendant can satisfy its burden by presenting evidence that negates an element of the

9.

cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to support an element of the cause of action. [Citation.] If the defendant meets this burden, the burden shifts to the plaintiff to set forth 'specific facts' showing that a triable issue of material fact exists. [Citation.] [¶] We review the trial court's ruling de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opposing party. [Citation.] We will affirm an order granting summary judgment . . . if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons." (*Securitas Security Services USA, Inc. v. Superior Court* (2011) 197 Cal.App.4th 115, 119–120.) We examine the evidence submitted in connection with the summary judgment motion, with the exception of evidence to which objections have been appropriately sustained. (Code Civ. Proc., § 437c, subd. (c); *Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 711.)

Winston contends the trial court erred by concluding there was no triable issue of fact as to whether her government claim against the County was timely filed. Winston asserts there is a triable issue of fact as to whether her medical malpractice claim against the County accrued on August 31, 2012, after Winston's first surgery, or in August 2013, when her attorney obtained and reviewed her medical records.

The Claims Act establishes certain conditions precedent to the filing of a lawsuit against a public entity; as relevant here, a plaintiff must timely file a claim for money or damages with the public entity (§ 911.2, subd. (a)), and the failure to do so bars the plaintiff from suing the entity. (§ 945.4.) (*California Restaurant Management Systems v. City of San Diego* (2011) 195 Cal.App.4th 1581, 1591.) " 'The policy underlying the claims presentation requirements is to afford prompt notice to public entities. This permits early investigation and evaluation of the claim and informed fiscal planning in light of prospective liabilities.' " (*Ibid.*) Because the purpose of a claim is to provide the public entity with sufficient information to enable it to adequately investigate claims and

potentially settle them without the expense of litigation, it is well-settled that claims statutes must be satisfied even if the public entity has actual knowledge of the circumstances surrounding the claim.  (*Ibid.*)

Here, Winston was required to file her personal injury claim with the County no later than six months after "the accrual of the cause of action."  (§ 911.2, subd. (a).)  For purposes of the claims presentation deadline under the Claims Act, a cause of action accrues " 'on the same date a similar action against a nonpublic entity would be deemed to accrue for purposes of applying the relevant statute of limitations.' "  (*K.J. v. Arcadia Unified School Dist.* (2009) 172 Cal.App.4th 1229, 1242, italics omitted; § 901.)  Generally speaking, a cause of action accrues at "the time when the cause of action is complete with all of its elements."  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*).)  An important exception to the general rule of accrual is the "discovery rule," which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action."  (*Ibid.*)

A plaintiff has reason to discover a cause of action when he or she "has reason at least to suspect a factual basis for its elements."  (*Norgart*, *supra*, 21 Cal.4th at p. 398, quoting *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110 (*Jolly*).)  Under the discovery rule, suspicion of one or more elements of a cause of action, coupled with knowledge of any of the remaining elements, will generally trigger the statute of limitations period.  (*Norgart* at p. 398, fn. 3; *Jolly* at p. 1112.)  Our Supreme Court explained in *Norgart* that by discussing the discovery rule in terms of a plaintiff's suspicion of "elements" of a cause of action, it was referring to the *generic* elements of wrongdoing, causation, and harm.  (*Norgart*, at p. 397.)  "In so using the term 'elements,' we do not take a hypertechnical approach to the application of the discovery rule.  Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least

11.

*suspect* that a type of wrongdoing has injured them." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807 (*Fox*).)

The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action. The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have " ' "information of circumstances to put [them] *on inquiry*" ' " or if they have " ' "*the opportunity to obtain knowledge* from sources open to [their] investigation." ' " (*Gutierrez v. Mofid* (1985) 39 Cal.3d 892, 896-897.) In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury and are charged with knowledge of the information that would have been revealed by such an investigation. (*Id.* at p. 897.)

"When the issue is accrual, belated discovery is usually a question of fact, but may be decided as a matter of law when reasonable minds cannot differ." (*Blanks v. Shaw* (2009) 171 Cal.App.4th 336, 375.) We agree with the trial court that, in this case, reasonable minds cannot differ.

Shortly after her second surgery in September 2012, Winston assumed her paralysis would be permanent and believed the paralysis was due to mismanagement of her surgery, as she was not paralyzed before the August 31 surgery but was paralyzed immediately thereafter. Winston asserts that while she may have suspected that Dr. Wiebe was negligent, she had no reason to suspect wrongdoing by KMC until after her attorney reviewed KMC's medical records in August 2013 and, at a minimum, there is a triable issue of material fact regarding whether she should have suspected KMC's negligence earlier.

Based on Winston's declaration, she suspected, at least by September 2012, that her injury was due to medical negligence. Having knowledge of her injury, she was required to conduct a reasonable investigation as to its cause and is charged with

knowledge that could have been uncovered by a timely reasonable investigation. (*Fox*, *supra*, 35 Cal.4th at p. 808.)

The discovery rule, as described in *Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926 (*Bernson*), allows accrual of a cause of action even if the plaintiff does not have reason to suspect the defendant's identity. (*Bernson*, *supra*, 7 Cal.4th at p. 932.) In that situation, accrual is not delayed because the defendant's identity is *not* an element of a cause of action. (*Norgart*, *supra*, 21 Cal.4th at p. 399; *Bernson*, at p. 932.) As the court reasoned in *Norgart*, "It follows that failure to discover, or have reason to discover, the identity of the defendant does not postpone the accrual of a cause of action, whereas a like failure concerning the cause of action itself does." (*Norgart*, at p. 399.)

In *Norgart*, our Supreme Court distinguished between ignorance of the defendant's identity and ignorance of the cause of action based on " 'the commonsense assumption that once the plaintiff is aware of' the latter, he 'normally' has 'sufficient opportunity,' within the 'applicable limitations period,' 'to discover the identity' of the former." (*Norgart*, *supra*, 21 Cal.4th at p. 399, quoting *Bernson*, *supra*, 7 Cal.4th at p. 932.)

"Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of *all potential causes* of that injury. If such investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light." (*Fox*, *supra*, 35 Cal.4th at pp. 808-809, italics added.) In order to adequately allege facts supporting a theory of delayed discovery, Winston had to establish that, despite diligent investigation of the circumstances of the injury, she reasonably could not have discovered facts supporting the cause of action within the applicable limitations period. (*Id.* at p. 809.)

Here, if Winston had begun investigating her claim sooner, she could have discovered all facts supporting her medical malpractice cause of action against the County within the applicable six-month claims presentation period, as the information was contained in her medical records, which were available to her at any time. That she did not discover this information sooner was not due to any delay in discovering her injury; instead, it was due to her failure to pursue an investigation within the six-month period. Winston did not commence an investigation until she contacted her attorney in the spring of 2013 – some six to eight months after knowledge of the injury and that the injury's cause was in all likelihood medical malpractice. While Winston assumed, without any investigation to support that assumption, that the cause related to Dr. Wiebe's treatment and not to treatment she received at KMC, Winston could have discovered the identities of all potential medical professional defendants had she acted more quickly. (*Norgart*, *supra*, 21 Cal.4th at p. 399.)

Winston contends she did not suspect or have reason to suspect one of the core elements of her claim, a cause of action against KMC, until after her attorney reviewed the full medical records. She cites *Fox* for the proposition that the delayed discovery rule operates to postpone the running of the presentation period on her claim against KMC. She is incorrect for two reasons: (1) she fails to distinguish here between the identity of the wrongdoer and the cause of action (medical malpractice); and (2) *Fox* does not support her analysis.

In *Fox*, the plaintiff had timely pursued a medical malpractice claim. In the course of pursuing that claim, the plaintiff uncovered facts supporting a products liability claim when one physician testified in his deposition that a device used during surgery had malfunctioned. (*Fox*, *supra*, 35 Cal.4th at p. 804.) The plaintiff filed a first amended complaint adding the manufacturer of the device as a named defendant and asserting a products liability cause of action against the manufacturer. (*Ibid.*) The manufacturer demurred, contending the products liability claim was barred by the one-year statute of

14.

limitations. (*Id.* at p. 805.) The trial court sustained the demurrer without leave to amend, reasoning that when a plaintiff sues based on knowledge or suspicion of negligence, such as medical malpractice, the statute of limitations begins to run as to all defendants, including manufacturers possibly liable under products liability theories. (*Ibid.*) The Court of Appeal reversed and remanded with directions to grant the plaintiff leave to amend so she could allege facts explaining why she did not have reason to discover the factual basis of her products liability claim earlier. (*Id.* at pp. 805-806.)

Our Supreme Court affirmed the Court of Appeal's decision. (*Fox*, *supra*, 35 Cal.4th at p. 816.) The Court concluded that, "under the delayed discovery rule, a cause of action accrues and the statute of limitations begins to run when the plaintiff has reason to suspect an injury and some wrongful cause, unless the plaintiff pleads and proves that a reasonable investigation at that time would not have revealed a factual basis for that particular cause of action." (*Fox*, at p. 803.) The Supreme Court agreed with the Court of Appeal that while the plaintiff alleged she did not discover or suspect, and there were no means through which her reasonable diligence would have revealed or she would have suspected, that the device was a cause of her injury until the physician's deposition, the complaint did not sufficiently allege specific facts supporting these allegations. (*Id.* at p. 811.) The Supreme Court also agreed that the plaintiff should have been given leave to amend, as her proposed amended complaint added facts to support her allegation that she did not suspect, nor did she have reason to discover, facts supporting a products liability action against the manufacturer until after the physician's deposition. (*Ibid.*)

Winston asserts that her claim against KMC did not accrue until she had a reasonable suspicion that KMC did something wrong, since, as in *Fox*, her claims against Dr. Wiebe and KMC constitute two distinct causes of action that are based on different theories. But according to *Fox*, the question that is pertinent to the delayed discovery rule is not when Winston reasonably suspected KMC did something wrong, but whether she conducted a reasonable investigation of *all* potential causes of her injury after she

15.

suspected medical malpractice.  (*Fox*, *supra*, 35 Cal.4th at p. 811.)  Under *Fox*, once Winston suspected an injury (paralysis) and some wrongful cause (medical malpractice), her claim for medical malpractice against KMC accrued unless she was able to prove that a reasonable investigation at that time would not have revealed a factual basis for her claim against KMC.  (*Fox*, at p. 803.)

Here, Winston suspected medical malpractice within a month of her August 2012 surgery.  It was incumbent on her to show that a reasonable investigation at that time would not have revealed KMC's alleged role in her injury.  She has not done so.  Instead, her evidence shows the opposite – that a reasonable investigation would have uncovered KMC's role since, once she obtained an attorney, the attorney was able to promptly obtain medical records and identify a potential claim against KMC.

Winston argues the date of accrual of her malpractice claim against KMC is a disputed issue of fact for the jury to decide.  She is wrong.  There are no disputed facts for the jury to decide.  The only task remaining is the application of the law to those facts.  That is a function the trial court performs in the first instance, and we perform on review.  Winston may dispute the trial court's legal conclusion, and ours on review, but such a dispute does not create an issue of material fact for the jury to decide.

Winston's cause of action for medical malpractice against KMC accrued at the latest when she suspected malpractice at the end of September 2012.  Winston, however, did not file her claim until more than six months later, on August 29, 2013.  At that point, her only recourse was to file an application for leave to present a late claim and, if that was denied, petition the superior court for late claim relief.  (§§ 911.4, subd. (a), 946.6.)  Leave to file a late claim must be requested within a "reasonable time not to exceed one year after the accrual of the cause of action."  (§ 911.4, subd. (b); *Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1779.)  Winston, however, never filed an application for leave to file a late claim, nor has she petitioned the superior court for late claim relief.  Her failure to do so bars her action as a matter of law.

16.

Winston contends it was improper for the County to unilaterally decide, without a jury determination, when her cause of action accrued and thus whether late claim relief must be sought, citing *Scott v. County of Los Angeles* (1977) 73 Cal.App.3d 476, 481.  In *Scott*, the County rejected a malpractice claim as untimely; a second claim was treated as an application for late filing and also rejected.  (*Scott*, *supra*, 73 Cal.App.3d at p. 479.)  On appeal from the trial court's denial of the plaintiff's petition for late claim relief under section 946.6, the appellate court held that the section 946.6 proceeding was a redundancy and the petitioner was free to proceed on the complaint notwithstanding the trial court's refusal to grant relief.  (*Scott*, *supra*, 73 Cal.App.3d at pp. 481, 484-485; see *Ngo v. County of Los Angeles* (1989) 207 Cal.App.3d 946, 950.)

But here, Winston never petitioned for late claim relief.  Instead, she proceeded on her complaint, alleging that she complied with the claims presentation requirements.  By doing so, she placed at issue the timeliness of her claim, including the date of accrual of her cause of action against the County.  (*Mandjik v. Eden Township Hospital Dist.* (1992) 4 Cal.App.4th 1488, 1499 (*Mandjik*); *Rason v. Santa Barbara City Housing Authority* (1988) 201 Cal.App.3d 817, 827-828.)  The issue of accrual was properly submitted to the trial court and reviewed by us on appeal.  If the County was mistaken in its assessment, the two-year rather than the six-month statute of limitations under section 945.6, subdivision (a), would have applied.  (*Mandjik*, *supra*, 4 Cal.App.4th at p. 1500.)

Finally, Winston contends that the County is estopped from asserting the defense of failure to present a timely claim because it waived its right to do so by giving a defective notice of late claim.  As Winston points out, section 911.3, subdivision (a) provides the form of notice the public entity is required to give when it rejects a claim as untimely: "The notice shall be in substantially the following form: [¶] 'The claim you presented to the (insert title of board or officer) on (indicate date) is being returned because it was not presented within six months after the event or occurrence as required by law.  See Sections 901 and 911.2 of the Government Code.  Because the claim was not

17.

presented within the time allowed by law, no action was taken on the claim. [¶] Your only recourse at this time is to apply without delay to (name of public entity) for leave to present a late claim. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the Government Code. Under some circumstances, leave to present a late claim will be granted. See Section 911.6 of the Government Code. [¶] You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.' "

Here, the notice that the County sent to Winston's attorney contained all of the above information with the exception of the reference to Sections 901 and 911.2 following the first sentence. "It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act. [Citations.] Estoppel most commonly results from misleading statements about the need for or advisability of a claim; actual fraud or the intent to mislead is not essential." (*John R. v. Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 445; see also *Ortega v. Pajaro Valley Unified School Dist.* (1998) 64 Cal.App.4th 1023, 1044–1045, citing cases.)

"Estoppel most commonly results from misleading statements about the need for or advisability of a claim. [Citations.] Estoppel may also be invoked where conduct on behalf of the public entity induces a reasonably prudent person to avoid seeking legal advice or commencing litigation." (*Christopher P. v. Mojave Unified School Dist.* (1993) 19 Cal.App.4th 165, 170; see *Fredrichsen v. City of Lakewood* (1971) 6 Cal.3d 353, 357.)

Winston does not specify any act or statement by the County that prevented her from filing a timely claim or from filing an application for leave to present a late claim. She does not assert that the County's notice misled her in any way. Instead, she argues that the County's omission of the code citations "fraudulently induces a plaintiff to try the factual issues of accrual at the administrative level rather than before a jury." Without an allegation that the County's notice deterred her from presenting a claim, she has not

18.

established even a colorable estoppel claim. (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 744.)

In sum, contrary to Winston's contention in the trial court and on appeal, ignorance of the defendant's identity does not delay accrual of a cause of action. (*Fox*, *supra*, 35 Cal.4th at p. 807; *Norgart*, *supra*, 21 Cal.4th at p. 399.) Winston does not dispute that she suspected that her paralysis resulted from medical malpractice within a month of her August 31, 2012 surgery. Winston, however, made no showing that she could not have uncovered the role KMC played by a diligent pursuit of her medical malpractice action. No such showing could be made because the information was readily available in her medical records and would have been discovered had she pursued her cause of action once she suspected medical malpractice.

As there is no triable issue of material fact, what remains is an issue of law for us to decide. (*Aguilar v. Atlantic Richfield* (2001) 25 Cal.4th 826, 850.) We conclude that proper application of the limitations period to the undisputed facts requires that judgment be entered for the County.

## DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to the County.


_____

GOMES, Acting P.J.

WE CONCUR:


_____

PEÑA, J.


_____

SMITH, J.